IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2009

## STATE OF TENNESSEE v. JASON M. JUSTICE

**Direct Appeal from the Circuit Court for Madison County**
**No. 07-568    Roger A. Page, Judge**

—————————

**No. W2008-01009-CCA-R3-CD  - Filed June 15, 2009**

—————————

The defendant, Jason M. Justice, was convicted by a Madison County Circuit Court jury of first degree murder and sentenced to life imprisonment. On appeal, he challenges the sufficiency of the convicting evidence, the trial court's admission of evidence concerning an alleged robbery of the defendant by the victim, and the trial court's admission of text messages between the defendant's girlfriend and another witness. After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

George M. Googe, District Public Defender, and Paul E. Meyers, Assistant Public Defender, for the appellant, Jason M. Justice.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and James W. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

This case involves the June 13, 2007, shooting of the victim, Anthony Hartshaw, while he was sitting inside his car on Lincoln Street in Jackson, Tennessee. The investigation resulted in the defendant's indictment on one count of first degree premeditated murder and one count of coercion of a witness.[1] A trial was conducted on the matter in February 2008.

———————————

[1] The coercion of a witness charge was dismissed at the end of the State's proof.

At trial, Oakley McKinney, special agent and forensic scientist with the Tennessee Bureau of Investigation (TBI), testified that he analyzed fingerprints and palm prints sent to him by the Jackson Police Department that were lifted from an automobile linked to this case. Neither the fingerprints nor the palm prints matched known prints for the defendant or the believed passenger, Anthony Drew Jones. On cross-examination, Agent McKinney agreed that there was no physical evidence linking the defendant to the car used in the murder.

Officer Robert Faulkner with the Jackson Police Department testified that he responded to a shots fired call at 288 Lincoln Street on June 13, 2007. When he arrived, he found a burgundy Chevrolet El Camino parked in the side yard of the house, Ladenner Bond sitting in the driver's seat, and the victim slumped over in the passenger's seat. He asked a "somewhat hysterical" Bond to step out of the car and opened the passenger's side door to check the victim's vital signs. The victim "didn't have any" vital signs and did not appear to be breathing. Officer Faulkner saw a pool of blood and a small amount of vomit on the floor of the car. When other officers arrived on the scene, Officer Faulkner went inside the house and took a statement from Bond. The El Camino was later towed to the city pound for processing.

Officer Rochelle Staten with the Jackson Police Department testified that she responded to a shooting at 288 Lincoln Street on June 13, 2007, around 4:00 p.m. At the scene, she saw a man, who had been shot in the head, slumped over inside a "rust colored" vehicle. The victim's girlfriend, Ladenner Bond, was at the scene and was very emotional, "almost hysterical." Bond relayed to Officer Staten what had happened and described the car involved in the incident as "a black Pontiac Grand Am with dark tinted windows . . . [and] dealership tags, the red and white tags." Based on Bond's description, the police issued a "be on the lookout" (BOLO) for that vehicle.

On cross-examination, Officer Staten recalled that Bond said the car was a Grand Prix, not a Grand Am. Bond also told her that the suspect looked like Newt Carter and generally described the suspect as "[d]ark skin, black male with a short . . . afro." Bond relayed to Officer Staten that she believed the victim knew the suspect because "when [the victim] was standing by his car and the car pulled up into the yard, that he didn't make any move as if he did know the person, that he kind of stood there."

Lieutenant Michael Holt with the Violent Crimes Unit of the Jackson Police Department testified that he responded to the scene of the shooting around 3:45 p.m. on June 13, 2007. At the scene, Lieutenant Holt observed a maroon El Camino sitting in the yard with what appeared to be a bullet hole in the driver's door below the mirror. He noted there was no exit hole on the other side of the door, which suggested that the bullet did not penetrate the interior and was still lodged in the door. Lieutenant Holt saw the victim, with a gunshot wound to the left side of his head, lying on his right side across the passenger seat with his head slightly out of the ajar passenger door. There was blood on the victim's head wound and arm. The location of the victim's gunshot wound indicated that the shooter was on the driver's side of the vehicle. Lieutenant Holt took photographs and measurements of the scene and had a diagram prepared. He also had the car towed to the evidence bay for further processing.

Assistant Coroner Eric Echtenkamp of the Madison County Medical Examiner's Office testified that he responded to the scene on Lincoln Street on June 13, 2007, where he found the deceased victim "partially in, partially out of a vehicle" with a wound to the left side of his head consistent with a gunshot wound. The victim's body was transported to the hospital where Echtenkamp examined the body again and an x-ray suggested that a bullet was lodged in the cranial cavity of the victim's head. Echtenkamp said that the victim's body was subsequently transported to Nashville for an autopsy.

Investigator Michael Parson with the Jackson Police Department testified that he assisted Lieutenant Holt in investigating the crime scene on Lincoln Street on June 13, 2007. Investigator Parson took measurements and drew a sketch of the scene, then went to the hospital to photograph the victim's body. He later retrieved a bullet or bullet fragment from the medical examiner's office in Nashville that was removed during the victim's autopsy and transported it back to the Jackson Police Department.

TBI Special Agent/Forensic Scientist James Russell Davis, II, testified that he performed a gunshot residue test on a sample from the vehicle suspected to have been involved in the shooting and a sample from that vehicle's steering wheel cover and that both results were negative. Agent Davis noted that a negative result, however, does not conclusively indicate that a gun was not fired from that car.

TBI Special Agent/Forensic Scientist Bradley Everett testified that he tested the steering wheel cover from the suspected vehicle for the presence of blood but did not find any. He also performed a DNA test on skin cells found on the steering wheel cover, but due to the limited profile he could only determine that the DNA was from a male. Agent Everett explained that his finding did not mean that a female had never touched the wheel cover – that it was "very possible" for someone to be in a car and not leave DNA evidence. On cross-examination, Agent Everett acknowledged that he could not tell who had or had not been in the car.

Ladenner Bond, the victim's girlfriend, testified that she and the victim were at her mother's house on Lincoln Street on June 13, 2007, having a conversation on the porch. The victim walked to his El Camino that was parked in the field next to her mother's house and had just sat down in the driver's seat, when "a black car pulled up to the curb and fired a couple of shots at him" and drove off. Bond elaborated that the black car pulled up next to the victim's car from the "[o]pposite direction, driver to driver." She stated that more than one shot was fired. She was able to see the driver-gunman from the side but did not recognize him. Bond saw a second person in the front passenger seat and thought she saw a third person in the backseat but was not certain.

Bond testified that after the shots were fired, she went to the victim's car and found the victim slumped over toward the passenger door with blood coming out of his mouth. Bond got into the car and held the victim while her nephew telephoned for help, but the victim died before the police arrived. Bond gave a description of the gunman's vehicle to the police and described it as a black Grand Am or Grand Prix with red dealer's tags. She said the car was similar to the car

belonging to the girlfriend of the victim's friend, "Mighty,"[2] and that she had seen "Mighty" driving it. After reviewing the statement she gave to Investigator Miller after the incident, Bond also recalled that the suspect car had tinted windows, a fin on the back, and a sunroof. Bond identified photographs of the car used in the shooting for the police. However, she was unable to positively identify the gunman from photographic lineups, and she did not see the passenger well enough to be able to identify him or her. Bond said that she knew Anthony Drew Jones and was sure he was not the gunman.

On cross-examination, Bond testified that after the shooting she told the police that the gunman was a dark-skinned black male. She said that she told the police the gunman's hair resembled Newt Carter's hair, "like he had it braided and had just taken it down or something," but she did not say the gunman looked like Newt Carter. Bond stated that Investigator Miller "got it mixed up" by putting in her statement that, on a scale of one to ten, she was a seven sure the gunman was "Mighty." She elaborated that she told him "it resembled ['Mighty'] . . . by the car[, but she] . . . knew it was not him." She noted that "Mighty" is bald. Bond pointed out that the only difference between the car she had seen "Mighty" drive and the car the shooter drove was that the car from the shooting had a red license tag and a plate on the front. She identified "Mighty" from a photographic array for the police. She said that the victim knew "Mighty," but she did not know if he knew Newt Carter, Anthony Jones, or the defendant.

On redirect examination, Bond testified that she never indicated "Mighty" was the gunman; she said the gunman resembled "Mighty" but could not have been him because "Mighty" did not have any hair. She said that she only referred to "Mighty" because she had seen him in a car similar to that driven by the gunman. Bond said that she was unable to identify the gunman in a photographic lineup, but elaborated that when the defendant turned to the side in court that morning, "it struck [her] that that was him." On recross examination, Bond reiterated that she never got a frontal view of the gunman during the shooting. Bond acknowledged that, to some extent, she would not have closure if she could not identify the gunman but denied that her judgment was cloudy.

Latoyia Anderson testified that she previously owned a 1999 four-door, black Grand Am GT, which she identified from photographs. Anderson was contacted by investigators because her car looked similar to the car used in the shooting. Anderson said that she had a white, regular tag on her car and that she was dating "Mighty" at the time she owned the car.

Sergeant Mike Turner, evidence custodian and crime scene investigator with the Jackson Police Department, testified that he and Aimee Oxley processed a maroon El Camino involved in the homicide of the victim. He discovered a bullet hole in the exterior of the driver's side door near the rearview mirror and found a spent bullet inside the door panel. The bullet was sent to the TBI crime lab. During the course of the investigation, Sergeant Turner also processed a 2000 black

---

[2]"Mighty" was also referred to interchangeably as "T-Mighty" at trial. Latoyia Anderson testified that his real name is Jameon Tipler.

Pontiac Grand Am, from which he recovered fingerprints and palm prints that were also sent to the lab.

Aimee Oxley, an evidence technician and gun crimes analyst with the Jackson Police Department, testified that she assisted Sergeant Turner in processing a burgundy Chevrolet El Camino. She found a bullet hole underneath the mirror on the driver's side door and located a spent projectile in the door panel.

Dr. Thomas Deering testified that he performed an autopsy on the victim on June 14, 2007. The autopsy revealed a gunshot wound to the left side of the victim's head, matching internal injuries, and external injuries associated with the gunshot wound. A bullet was recovered from the right side of the victim's head where it struck the other side of the skull and was sent to the Jackson Police Department. Dr. Deering noted a graze wound on the victim's left arm that appeared to have been caused by a bullet. Dr. Deering surmised that the graze wound and the gunshot wound to the head could have either been caused by two separate bullets or only one bullet. Dr. Deering ruled that the victim's cause of death was a gunshot wound to the head, and the manner of death was homicide. On cross-examination, Dr. Deering said that the victim's toxicology report revealed the presence of marijuana and cocaine, but on redirect he said that the presence of those drugs did not "contribute anything to the fact that he died of the gunshot wound."

Aisha Kyles testified that the defendant is her boyfriend and father of two of her children. She said that on June 13, 2007, she was at her apartment with Taquila Deloach, Ashlee Akins, Elisa Miller, the defendant, and Anthony Drew Jones. At some point, the defendant asked if he could borrow someone's car and asked specifically for a car with tinted windows. Kyles noted that her car was at the apartment and available for the defendant, but he did not ask. Her car did not have tinted windows. Deloach loaned the defendant her car, which was either a black Grand Prix or Grand Am with tinted windows. Kyles recalled that Deloach's car had red dealer tags on the back and a plate on the front with "Taquila" on it. Kyles stated that the defendant left the apartment twice, but she was not sure if Jones was with him the first time. However, she was sure Jones was with the defendant when he left the second time. The defendant did not indicate where they were going and was gone less than an hour.

When the defendant arrived back to the apartment, he instructed Kyles to get clothes for herself and the children. The defendant was sweating, "[h]yper and rushing." She saw the defendant in the kitchen putting bullets in a gun. While the defendant was loading the gun, Kyles' twelve-year-old sister arrived at the apartment and Kyles instructed the defendant to put the gun away. Kyles gathered necessities, left the apartment with her children and Jones, and went to her grandmother's house. Ashlee Akins and Taquila Deloach left in their vehicles, and the defendant left with Elisa Miller.

Kyles testified that the next morning, she received a call from Deloach who was hysterical and said that her car was in the newspaper. Later that day, Kyles[3] sent Deloach text messages from her phone. The first text message was: "When I'm done with these twists I'll be out there about six. If you need to go somewhere in between time call me and I'll bring you my car." Kyles said that Deloach still had her car at the time, but she offered to take Deloach anywhere she needed to go so she would not have to take her car. The second text message was: "I feel you. I'm mad as hell, too. I said to him that do you know how much trouble you brought on and we're going to get through this. Qui, I'm here, and I am upset." The third text message was: "Did you get my message?" And the last text message was: "I'm right with you. We're going to figure something out. I know it's hard but try to stay calm."[4]

Kyles testified that in February 2007, she was at her apartment when the defendant called her from outside to let her know that he had arrived. She heard a commotion, but thinking it was her neighbors, she did not find it out of the ordinary. She heard a knock on the door and saw the defendant's face through the peephole. She asked who was with him, and he told her "some of his partners." She unlocked the door, ran and hid in the closet, and was about to call 911 when a gun was put to her head and the phone taken away. She was tied up on the floor with the telephone cord and could hear the defendant being tied up with her belts. Her house was ransacked, and approximately $500 was taken from her purse. She did not see anything taken from the defendant, but he indicated to her that money was taken from him before he entered the apartment. After the robbers left, the defendant was able to free himself and then untied Kyles. They did not report the robbery to the police. Kyles said there were three robbers, but she was unable to identify them because they wore masks. The defendant later told her that he had heard that one of the robbers was "Amp," the victim.

On cross-examination, Kyles admitted that in her statement to police on June 15, she did not tell the officers about the defendant's borrowing Deloach's car or seeing the defendant with a gun. However, in a statement the next day, Kyles told the officers she had not been completely honest and informed them about those things. Kyles gave another statement on June 18, in which she told the officers about the prior robbery and said the victim was one of the robbers, not that she had only heard he was one of the robbers. In that same statement, Kyles named one of the other robbers, even though at trial she said she did not know who any of the three robbers were. Kyles admitted that the defendant did not know for a fact that the victim had been one of the robbers, but they both had heard it rumored. Kyles agreed that it was possible the defendant kept a gun hidden in the kitchen because she did not see him leave or come back to the apartment with a gun the day of the shooting.

On redirect examination, Kyles said that she initially was not honest with the police because she was scared and loved the defendant. She stated that she did not tell the officers about the earlier

---

[3] Kyles testified that her nickname was "Jamaican Queen," which was how she signed her text messages.

[4] The actual exhibits are written in text message shorthand. To aid in understanding, our recitation of the messages are how Kyles interpreted her shorthand at trial.

robbery during her second statement because they did not ask about it. She said that she understood it was wrong for her to have told the officers in her third statement that she knew who the robbers were if she did not actually know but had only heard it.

Agent Steve Scott of the TBI Firearms Identification Unit testified that he examined two bullets retrieved during the investigation of this case – one retrieved from a vehicle and the other retrieved from the victim during autopsy. Agent Scott determined that both bullets were.38 caliber and noted that typically bullets of that caliber were loaded into a .38 or .357 caliber gun. The class characteristics on the bullets indicated that they could have been fired from the same gun, but there were not enough individual characteristics for him to conclusively make that determination.

Agent Scott noted that the reason he could not make that determination was because the bullets were not typical .38 caliber bullets, but instead Nyclad bullets which are bullets with a "very thin, almost plastic-like coating." Agent Scott's opinion, based on manufacturers' characteristics, was that the two bullets came from a revolver of some type. Agent Scott stated that he had seen a Nyclad bullet loaded into a .9 millimeter weapon, but based on his experience, this particular shape of Nyclad bullet had always been associated with a revolver. He elaborated that the Nyclad bullet used in a .9 millimeter weapon has more of a rounded nose, and the bullets in this case were "semi-wadcutter," an inverted cup shape. On cross-examination, Agent Scott testified that Nyclad bullets are somewhat rare but, as far as he knew, were available in stores. He said there are a variety of different firearm brands that fire this particular bullet.

Ashlee Akins testified that she was at Aisha Kyles' apartment on June 13, 2007, with Kyles, the defendant, Taquila Deloach, Elisa Miller, and another man whom she did not know. At some point, the defendant asked to use Deloach's car, a black Grand Am or Grand Prix, so he could go to the store, and he and the other man left "for a little while." They returned and then left a second time. When they came back the second time, after being gone for less than an hour, the defendant "was kind of frantic" and told everyone to get out of the apartment. He screamed to Kyles, "Get your shit and let's go." Akins said the defendant "just seemed like he was a little nervous about something."

As she was getting ready to leave, Akins saw the defendant in the kitchen with a gun and "[h]e was taking some bullets out of the gun, emptying the bullets into his hands." She said the gun was silver, may have had a brown handle, and looked "kind of old." After reading her statement to the police, Akins recalled that she told the officers that the gun was "antique like, and [the defendant] was knocking bullets into his hand. The cylinder was open and it was round bullets in it." She reiterated that the defendant was emptying bullets from the gun into his hand. After she saw the gun, Akins left the apartment with Deloach.

On cross-examination, Akins testified that while the defendant was gone in Deloach's car, she and Deloach took Kyles' car to run errands and then returned to Kyles' apartment. They were gone approximately an hour and twenty minutes. The defendant and the other man returned to the apartment after Akins and Deloach had been back ten or fifteen minutes, so she estimated that the

-7-

men were gone approximately two hours. Akins stated that as she was leaving the apartment after seeing the defendant with a gun, she noticed the other man standing around outside and he appeared calm. On redirect examination, Akins reiterated that the time frames she mentioned on cross-examination were estimates.

Elisa Miller testified that she was at Kyles' apartment with Kyles, the defendant, Akins, Deloach, and a man named Drew on June 13, 2007. The defendant asked to borrow Miller's car because "he needed a car with tinted windows," but she did not have much gas. The defendant then borrowed Deloach's black Grand Am which had tinted windows and returned with Drew. The defendant left the apartment a second time, taking Drew with him, and was gone an estimated thirty to forty-five minutes. When the defendant came back, he was sweaty and breathing hard and told everyone to get their belongings and leave. Miller recalled that the defendant spoke with a calm voice but used profanity. Kyles left with Drew, and Miller drove the defendant to Denmark Headstart.

On cross-examination, Miller stated that her recollection was somewhat hazy and that she first said that the defendant and Drew had borrowed Akins' car. She admitted that she was not sure how many times someone came in and out of the apartment. Miller said that the only time Deloach and Akins left the apartment that day was when the defendant told them to leave. Miller acknowledged that in her statement to the police a few days after the incident, she did not say that the defendant used profanity when he told everyone to leave. Miller recalled that before the defendant left the apartment the second time, the time he took Drew with him, he first made or received a telephone call on the balcony outside. On redirect examination, Miller said that she did not remember the defendant cursing when he told them to leave the apartment. She recalled that when she dropped the defendant off at Denmark Headstart, he left in a car with a man she did not know.

Taquila Deloach testified that in June 2007, she owned a 2000 black Grand Am with tinted windows and a red dealer license tag. On June 13, Deloach was at Aisha Kyles' apartment discussing plans for a trip that weekend. The defendant and Elisa Miller were also at the apartment, and a man she did not know arrived later. At some point, the defendant asked to borrow a car with tinted windows, and Kyles told him that Deloach's car had tinted windows. Deloach agreed to let the defendant borrow her car, and he left alone but returned with the other man. Deloach estimated that the defendant was gone an "hour or so." The defendant then left in her car a second time, taking the other man with him, and they were gone approximately an hour.

Deloach testified that when the defendant came back the second time, he was acting very nervous and scared and told everyone to get their belongings and leave. She recalled that the defendant "was not calm at all" and used profanity. She saw the defendant with "a gun in his hand and he was emptying the shells" into his hand. Deloach described the gun as an "older gun, kind of rusty."

Deloach testified that she read the newspaper the next morning and saw that her car was wanted in conjunction with a murder. She called Kyles immediately and, during the course of the day, received text messages from her. She also received a call from the defendant soon after she called Kyles. The defendant told Deloach that she needed to "lay low," not drive her car, and change the dealer tag on her car to a regular tag. The defendant asked Deloach to meet him so he could give her some money to pay for the new tag, but she never met him.

On cross-examination, Deloach testified that Akins arrived at Kyles' apartment that day after she did but was there when the defendant borrowed Deloach's car. While the defendant was gone in her car the first time, Deloach and Akins left to run errands and were gone approximately an hour and a half. When they got back to the apartment, the defendant had already returned and had the other man with him. The defendant borrowed Deloach's car again, and after approximately an hour, Deloach had Kyles call the defendant because she needed her car in order to leave. The defendant returned "right away" after Kyles called him. Deloach acknowledged that in her statement to the police, she "may have" said that the defendant was only gone fifteen to twenty minutes the second time. She also acknowledged that in her statement, she did not relate that the defendant used profanity when he told everyone to leave the apartment nor did she relate that the defendant told them to get their belongings.

Patrick Williams, a senior draftsman with the Jackson-Madison County Planning Department, testified that at the request of Investigator Miller, he pulled an aerial photograph that included the area of Park Place Apartments and 288 Lincoln Street. The photograph was downloaded into the city's system on June 19, 2007. The linear distance between building five of the apartment complex and 288 Lincoln Street was 4,038 feet, and approximate driving distances ranged from 1.37 to 1.65 miles.

Investigator Tyreece Miller with the Jackson Police Department testified that Kyles lived in building five of the aforementioned apartment complex. Investigator Miller stated that there are two types of handguns, semi-automatics and revolvers. The main difference between the two is that an automatic is loaded with a magazine or clip inserted into the handle, and a revolver is loaded in the cylinder. He explained that, at a crime scene, an automatic was likely used if there were shell casings on the ground, and a revolver was likely used if there were no shell casings on the ground. Investigator Miller demonstrated that one had to empty the shell casings in his or her hand in order to unload a revolver. He said that no shell casings were found at the scene of the murder or in Deloach's car.

On cross-examination, Investigator Miller testified that he interviewed Ladenner Bond, and she identified a photograph of a black Grand Am as belonging to Latoyia Anderson and driven by Anderson's boyfriend, "Mighty." Bond said that car was the same or similar to the car driven by the suspects with the exception of the license plate. Investigator Miller recalled that Bond was shown photographic arrays that included the defendant's photograph but was unable to make an identification. He acknowledged that Bond indicated to him that, on a scale of one to ten, she was a seven sure the driver of the suspect's car was "Mighty." Investigator Miller confirmed that Bond

said in her statement that the gunman looked like Newt Carter or "Mighty," but he explained that Bond never positively identified either man as the gunman. On redirect examination, Investigator Miller testified that Bond indicated "right away" that the tag on the suspect's car was red and had always maintained that the tag was red. He noted that the tag on the car driven by "Mighty" was a standard white tag, and Deloach's car had a red dealer tag.

The defense recalled Ladenner Bond who testified that she did not know what type of gun the gunman used but that the barrel appeared to be silver. After reviewing her statement, Bond agreed that she told the police it was a semi-automatic pistol and that it "looked like a .9." She further agreed that in her statement she told the police, "I know it was an automatic because it was the kind that casings come out of." However, she said that as the gunman was firing she did not see any casings fall out, so she assumed they fell back into the car. Asked how she could say it was a semi-automatic gun if she did not see casings fall out, Bond explained that she did not know the difference between guns. She stated that she did not know exactly what kind of gun was used.

On redirect examination, Bond testified that she previously had seen a nine-millimeter gun and that the gun used in the shooting looked like the barrel of a nine-millimeter. On recross, Bond stated that she did not know the difference between the barrel of a semi-automatic and the barrel of a revolver.

After the conclusion of the proof, the jury returned a verdict of guilty of first degree murder, and the defendant was sentenced to life imprisonment. He appealed.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first challenges the sufficiency of the convicting evidence. He argues that there was no physical evidence linking him to the murder, that any reliable evidence was circumstantial, and questions discrepancies in various witnesses' testimonies. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

-10-

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A premeditated and intentional killing of another is first degree murder. Tenn. Code Ann. § 39-13-202(a)(1) (2006). Premeditation means that the intent to kill must have been formed prior to the act itself; a premeditated act is one done after the exercise of reflection and judgment. Id. § 39-13-202(d). The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000).

Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer premeditation include the use of a deadly weapon on an unarmed victim; the defendant's shooting of the victim after he had turned to retreat or escape; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime before the crime is committed, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971).

In the light most favorable to the State, the proof presented at trial showed that a few months prior to the murder the defendant and his girlfriend, Aisha Kyles, were robbed by a group of men, and the defendant came to believe that the victim was one of the robbers. The afternoon of the shooting, several people were at Kyles' apartment and heard the defendant request to borrow a car with tinted windows. Although Kyles' car was available, it did not have tinted windows and the defendant borrowed Taquila Deloach's black Pontiac Grand Am with tinted windows and a red dealer tag. The witness to the shooting, Ladenner Bond, the victim's girlfriend, saw a black Pontiac Grand Am or Grand Prix with tinted windows and a red dealer tag pull up, driver to driver, next to the victim's car. She saw the driver of that vehicle shoot the victim with a silver gun and drive away.

After the defendant had been gone in Deloach's car for approximately an hour, he returned to Kyles' apartment acting nervous and scared and demanding that everyone get their belongings and leave. Two witnesses saw the defendant removing what they described as bullets or shells from a gun, and one witness noted that the defendant's gun was silver. The bullets recovered as evidence in this case were fired from a revolver of some type, which is loaded in a cylinder and does not eject the shell casings. The day after the shooting, the defendant contacted Deloach and cautioned her to not drive her car and offered to pay to replace her red dealer tag with a regular tag.

We reiterate that any questions concerning the credibility of the witnesses or conflicts in the evidence were resolved by the jury as the trier of fact. Even though there was no forensic evidence tying the defendant to the murder, one forensic scientist testified that it was "very possible" for someone to be in a car and not leave DNA evidence. We conclude that the direct and circumstantial evidence was sufficient for a reasonable jury to conclude that the defendant killed the victim after the exercise of reflection and judgment.

## II. Past Robbery

The defendant next argues that the trial court erred in allowing evidence of an alleged robbery of him and Aisha Kyles committed by the victim, when proof of the past robbery was not found to be clear and convincing as required by Tennessee Rule of Evidence 404(b). The State argues that the evidence was properly admitted to show the defendant's belief that the victim had robbed him and thus provide motive for the murder.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). As our supreme court has explained:

> Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"

Gilliland, 22 S.W.3d at 270 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

The defendant is not entitled to relief based on his argument that the court failed to find proof of the past robbery to be clear and convincing as required by Tennessee Rule of Evidence 404(b) because Rule 404(b) only applies to prior bad acts of the defendant, not the victim. See State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002); State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997). Thus, no clear and convincing evidence that the victim committed the robbery was necessary, and the admissibility of the evidence was governed by Tennessee Rules of Evidence 401 and 402. Here, the evidence was relevant because it showed the defendant's belief that the victim robbed him and provided a motive and intent for the murder. The trial court did not abuse its discretion in admitting this evidence.

The defendant also mentions that the timing, the fact the trial had already started, of admitting the 404(b) evidence prevented him from putting on evidence of third parties with similar motives. The defendant is also not entitled to relief on this argument. As already determined above, this is not 404(b) evidence, and even if it were, there is no requirement in the rule that advance notice of its intended use be given to the defendant. See Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][b] (5th ed. 2005).

### III. Text Messages

The defendant lastly argues that the trial court erred in admitting into evidence four text messages sent by Aisha Kyles to Taquila Deloach. He argues that the text messages were hearsay and that two of the messages constituted improper lay witness opinion testimony. The State responds that the text messages were not hearsay and, with regard to the argument regarding lay witness opinion testimony, that the defendant did not object on that ground[5] and Kyles was not offered as an expert on the content of the messages.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001). Accordingly, we will not reverse the trial court's ruling on this issue absent a clear showing of an abuse of discretion.

The defendant contends that the four text messages were hearsay simply because they were made out-of-court. However, hearsay is not just an out-of-court statement; it must be offered to prove the truth of the matter asserted. In the first message, Kyles offered to transport Deloach if she needed to go anywhere. In the remaining messages, Kyles told Deloach that she was mad and said she told the defendant he had brought about trouble, asked if Deloach received her previous message, and advised Deloach they were going to "figure somethin[g] out and try [to] stay calm."

As asserted by the State, it is not clear that these messages were offered for the truth of the matter asserted. Moreover, the first, second, and fourth messages arguably fall under the state of mind exception to the rule against hearsay. See Tenn. R. Evid. 803(3). Regardless, even if the court erred in admitting the messages, due to the substantial testimonial evidence linking the defendant to Deloach's car, we cannot conclude that the error more probably than not affected the judgment. Tenn. R. App. P. 36(b). Therefore, any error was harmless.

The defendant also contends that two of the messages constitute lay witness opinion evidence that the defendant committed the murder, which is prohibited by Tennessee Rule of Evidence 701. Rule 701 provides that a lay witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2)

---

[5] The record shows that the defendant did state this ground in his objection.

helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. Tenn. R. Evid. 701(a). One of the messages was: "I feel you. I'm mad as hell, too. I said to him that do you know how much trouble you brought on and we're going to get through this. Qui, I'm here, and I am upset." The other message was: "I'm right with you. We're going to figure something out. I know it's hard but try to stay calm." While the defendant asserts that these messages somehow show that the sender believed the defendant committed the homicide, they appear to have little meaning other than, perhaps, to the sender and the receiver. Thus, we cannot conclude that they constitute an opinion on any matter, much less than that the defendant had committed the homicide.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-14-